across from the dope house.  Also Present was Carl and Ben(Benjamin Foster).
Nathaniel came and started talking to Ben and Carl.  When Petey returned
he call him across the street and asked him why his boy came into his face
telling him he could not sell drugs up on that corner no more?  Petteway
said that he did not know.  He said the same thing to Delon.

   After Nathaniel finished talking to Ben and Carl, Petey came back and
started talking to Ben and Carl and left, but he returned later.

   That at one point he saw the Petitioner come and talk to Ben for about
three minutes, but he did not talk to Petey.  Petitioner then went back around
the corner on Wade.  Petitioner came back three more times, twice driving
a Black Friebird and once in a red Corsica.

   That when Petey went home, Pops walked to the store with a friend.
He returned and hung out on the corner for a minute before he walked to his
car.  Everyone was leaving and he was getting ready to go around the corner
to a party on Evanston.  While walking with his back to Nathaniel's car,
he was pushing Carl in his wheelchair, Ben was walking towards Newport behind
him.  He turned to look and see if Nay-Nay was still talking to Ben, but
he was still walking towards Coplin to his car.  He turned back around and
he was looking towards Newport when he heard shots.

   He stated that he turned back around briefly and observed what was going
on.  After they started shooting he froze for a second and was looking at
the fire.  Ben came running past him and that made him run.  That it was
dark outside and the only light he knew about was on the corner of Newport.
That he could not see what kind of guns were being used, but could see the
fire coming out of them.  That he stopped for a second when the shooting
happened, but he did not turn around until the shooting started.

   When he started running he ran towards Evanston.  He ran to the house

3

where the party was, he didn't call the police, he went there to get <u>Pops</u> little brother.  When he got there he spoke with a friend of <u>Pops'</u> little brother and asked where was little Frank(Nathaniel's litle Brother).  He told him to tell Frank that someone was about to shoot up his brother.

He left the first house and ran down the street and banged on the door of little Franks friend's house and asked him to let him use his bike.  He did not call the police or an ambulance because he knew that they did not have a phone.  The reason he went to the house on Evaston was to get a bike so that he could ride it around the corner to tell Nathaniel's mother what happened, what's happening.  He did not call for medical help, all he thought about was getting away and telling <u>Pops</u> family what happened.

Petteway got the bike and rode over to Nathaniel's mother house.  He banged on the door because the door was locked, no one was outside and they could not look outside the house.  That Nay-Nay's girlfriend opened the door.  When he got there no one seemed to know what happened.  He told everyone what happened.  Marlene was in the house when he came in and that neither Marlene or Auneder were on the street when the shooting occurred.

Petteway don't know how much time had past before he got to Nathaniel's mother house after the shooting.  Nathaniel's uncle called the ambulance and police.  Once he told everybody what had happened they all ran down to the car where <u>Pops</u> was at.

That he rode to the hospital with Marlene and the first time he told anyone that the Petitioner did the shooting was at the hospital.  He later made statements to the police along with <u>Nay-Nay's</u> sisters.  They rode down to the police station in the same car and talked about what he saw.  That he wanted to see someone pay for Nathaniels Death.

On 12-5-90, the People called Paul Allen Taylor (TT II, pages 3-17).

4

He testified that there was a drug house on the corner of Camden and Newport and that he saw Petitioner's Co-defendant run from the police. He also heard the shots and came out of his house when the shooting was over and saw the decedent in the car. That the right side of the car had been shot up and the window was out.

On 12-5-90 the People called Marlene Prince, Pettway's grilfriend and the decedent's sister(TT II, pages 42-67), she testified that she saw the shooting. She was walking towards her brother as he got into the car. She was about four houses away when the shooting began. Three men came out from the trees, and one of the men was the Petitioner.

That she turned around and ran home to tell her mother. She arrived before Pettway who she saw on the corner during the assault.

On 12-5-90, the People called another sister of the decedent, Auneder Cunningham(TT II, pages 69-89), she testified that she went up to Camden and Newport on July 28, 1990, about 8 O'clock in the evening. She saw her brother, Shaun, Ben, Petey and some other people. She stayed on the corner for about five minutes.

Around one O'clock the next morning while on her way to the gas station at Evanston and Chalmers, to buy cigarettes for her mother, she saw The Petitioner on Wade street. On her way back she heard gunshots while on Hampshire and Chalmers and saw the Petitioner get into a black Firebird or Trans Am on Hampshire. She also saw her brother Frank walking on Hampshire between Coplin and Newport.

Ms. Cunningham went to a friends house before going home. On her way home, "a guy named Jerry" who lived in the middle of the block told her that her brother had been shot which was confirmed by her uncle Robert. She did not hear Fred Pettway bang on her family's door and announce that her brother

5

was shot nor did she see him and her sister Marlene Prince at the hospital.

On 12-5-90 the Prosecution called Delon Taylor (TT II, pages 101-104), who talked about his relationship with the Petitioner and that after Pops told him that he could not sell drugs anymore he never spoke to the Petitioner about that conversation.

On 12-6-90 after Nathaniel's family members testified against the Petitioner, several police witnesses were called to identify photographs and physical evidence taken from the crime scene, to give gun test results, and to detail the Petitioner's arrest. The final witness is the case-in-chief was the Officer in charge Richard Ivy.(TT III, pages 3-34)

After the prosecution rested Defense counsel motion for a directed verdict. Following the Court's denial of his motion for directed verdict, (TT III, 12-6-90, page 40). Petitioner presented an alibi defense: On 12-6-90, Carmen Knight,(Petitioner's girlfriend), testified that she was employed as a clerk at 36th District Court. On July 29, 1990, she stayed on 18400 Weaver, off Plymouth and Southfield, which is about 20 minutes from Petitioner's house. That at the time of the shooting Petitioner was at her house. It was about 12:50 am or 1:00 am when Petitioner came over. She knew the time, because she looked at the clock every time Petitioner came over, because Petitioner would say a time and come over at a different time. And she knew the time that he left, because she looked at the clock and told him to call when he got home.(TT III, pages 41-65)

On 12-6-90, the Defense called Kenneth Cannon, a college student and a resident on Camden Street, who called the police after hearing the shots ad being the first person on the scene. Mr. Cannon saw the family arrive at the scene after a crowd had gathered. (TT III, 12-6-90, pages 72, 75). They moved the decedent from the car. (TT III, 12-6-90, page 82).

6

The Defense rested and the People called Kenya Drew as a witness to the alibi defense.  The young women testified that she was on the telephone with Co-defendant Roderick Bass from midnight until two o'clock in the morning.  At one point, she heard her brother Kent Drew, the Petitioenr, and another person named Tony talking in the background. (TT III, 12-6-90, pages 90-91).  She gave police Sergeant Ivy these facts in a written statement. (TT III, 12-6-90, page 95).

Ms. Drew testified that it was at the beginning of the phone conversation with Roderick Bass that she heard the other men's voices. (TT III, 12-6-90, page 91).  The prosecutor attempted to impeach her with her written statement, that is, nowhere in the statement does she ever say that she only heard Petitioner at the beginning of the conversation. (TT III, 12-6-90, page 104).  She explained on cross-examination that the Officers did not ask her that question. (TT III, 12-6-90, page 107).  Either way, if she heard the Petitioner in the back ground at the beginning, the middle, or the end it would have been impossible to be at two places at the same time.

This concluded the testimony taking part of the trial and the jury was excused for the weekend.

On December 10, 1990, a bench conference was held out side the presence of the Petitioner, present was trail counsel for both defendants, the prosecution, Petitioner's Co-defendant was setting at the Defense table, and two jurors, who approached the bench about being approached by an unidentified man about the case:

"The Court: Would you tell the Court what the problem is?

Juror No. 13: I was approached down in the vestibule while waiting on my ride by someone that was sitting in the Courtroom Thursday. He had on a brown leather jacket, and he said, "I just want you to know both of my boys are innocent."

The Court: The person is out there now?

7

Juror No. 10: No.
At the time we were in the parking lot.

Juror No. 13: And he asked me, "would you like a ride home?," and I said, "No, thank you."

The Court: All right.
Is that going to make a difference at all to you?

Juror No. 13: Well, no, but I don't appreciate being approached like that.

The Court: As I said before, you did the right thing. If anybody says anything to you, you're to report it to the Court and that's what i said before. If you see the person in the Court, please advise me. He in not here now?

Juror No. 13: No.

Juror No 10: No.

The Court: Just advise the Court if you see him.

Prosecutor: Could you ask whether they may have told any other jurors?

Juror No. 10: It was four of us in the parking lot. They all knew; they heard it. There was a lot of people in the immediate area.

Prosecutor: Maybe when the jurors all come out, if we could ask them whether or not that's going – –

The Court: (Interposing) All we're doing is spreading it around. They said they didn't discuss it with anyone, they did what they were told to do and it doesn't make any difference to them.

Defense Counsel: Could you identify for us who the four people were? Do you know the names?

Juror No. 10: The people in the jury?

Defense Counsel: Yes.

The Court: You want to bring them out, too?

Defense Counsel: I think we should, just to cover – –

The Court: (Interposing) Would you send the other four people out? (Where upon Juror No. 2, Tyra Williams, Juror No. 5, Zena Simmons, and Juror No. 6, Kay Clay, were brought up to the bench)

The Court: Did you hear any conversation between the other Jurors and some other person out side: anything that was said to anyone?

8

Juror No. 5: No, he said together to the four of us.

The Court: What was said to you?

Juror No. 5: "My boys didn't do it" or something.

The Court: Did that make a difference?

Juror No. 5: No.

The Court: Not at all?

Juror No. 5: We were all together.

The Court: Did you hear it too?

Juror No. 6: Yes, he said, "Don't send my boys to jail; there innocent" or something like that.

The Court: As I said, anything like that, just report it to the Court and the purpose of this is to find out if tat would have any affect on you.

Juror No. 6: No.

Juror No. 2: No.
(Trial Transcripts, December 12, 1990, pages 3-6)

After the court spoke with the jurors, trial counsel for the Petitioner asked for the production of the Petitioner, who was not present in the court room at the time the jurors brought the issues of tampering to the court. (TT IV, 12-10-90, page 6). In Petitioners presence, Defense counsel moved for a mistrial on two grounds: (1) improper rebuttal evidence, and (2) the taint of the jurors by an unidentified person. (TT IV, 12-10-90, page 6-13). The motion was denied. (TT IV, 12-10-90, page 10).

The Court also denied Petitioner's request for the lesser included offense of Manslaughter. (TT IV, 12-10-90, pages 17-18). The Court reasoned that revenge and provocation was not the same thing.

Arguments were made by all Counsels and the jury was instructed. Within two hours, the jury reached a verdict. Petitioner, Tommie Lee Seymore, was found guilty of Murder in the First Degree and Felony Firearm and Co-defendant

Roderick Bass was found not guilty. (TT IV, 12-10-90, pages 151-152). All five of the jurors who had contact with the outsider participated in the deliberations and verdict.

On December 20, 1990, Petitioner, Tommie Lee Syemore, was sentenced to life without parole for the murder conviction and a mandatory consecutive two years term on the gun charge. (Sentencing Transcripts, Page 11)

On February 8, 1991, Counsel for the petitioner argued a motion for new trial before the trial Court Judge, arguing that Petitioner's was denied his right to a fair, impartial, and unprejudiced jury. That there was no investigation as to the truth or falsity of the statement of the jurors; no opportunity given Petitioner to refuse his connection with the incident, if it had been stated by the jurors to their fellow jurors that they had been approached on behalf of the Defendant; no inquiry as to which party was responsible, if either was.

That the mentioning of the Mafia by the prosecution to explain why no one other than the decedents family came forward as inappropriate and it further added to the likely hood of prejudice. There was no suggestion in anyway, shape or form that referenced to an infamous entity such as the Mafia might be appropriate. Considering the nature of the shooting. Then the prosecution mentions Mafia. It can be considered as an attempt to intimidate the jury; the linkage is almost inescapable.

The mentioning of the Kittie Genovese case and no caution being given regarding this case. Where Kittie Genoveses was raped and murdered on 38th street in Manhatten and 40 to 50 people heard her yelling and screaming at such a time as they could have prevented the crime or come to her assistance and not one of them did. When all the factors add up overwhelming prejudice was visited upon the Petitioner by those three events which is inescapable.

10

That the standard set forth in <u>People</u> v <u>Levey</u>, 206 Mich 129 (1919) should have been followed and that the motion for new trial should have been granted.(Motion for New Trial Transcripts, 2-8-91, pages 2-20). This Motion was denied on 2-8-91.

On 11-13-91, Appellate counsel filed a motion for Evidentiary Hearing or for a New trial pursuant to <u>People</u> v <u>Ginther</u>, 390 Mich 436 (1973), along with Petitioner's appeal of right. Claiming trial counsel failed to produce res gestae witnesses or seek Prosecutor's assistance in producing them; failed to protect Petitioner's interest during Courts inquiry into improper communications; and failed to investigate potential defense.

On 5-13-92, the Michigan Court of Appeals Granted the Motion for Ginther Hearing to be held. Attorney William Daniel(Ginther Hearing TT, pages 4-28), testified as to his reasons for his trial strategy. During this Hearing <u>res gestae</u> witness Carl Foster testified(pages 29-41), that he was with the decedent the night he died and that he was a very good friend of his. That he was sitting in his wheelchair on the night in question. That Pettway and Ben was present. They all were on the street that night, but Ben and Pettway was on the corner of Newport and Camden when the shooting occurred. That he saw who shot Nathaniel.(at no time did he say that it was the Petitioner). That he know the Petitioner. That Pops and Pettway was not just standing on the corner of Newport and Camden, he indicated they were selling drugs. That he did not testify earlier because he did not want to get involved, because he did not want to get into it with Nathaniel's family and other things.

On 8-7-92, Part two of the Ginther Hearing(pages 3-10), Thomas Ware(Petey), testified that he was approached by the decedent and threatened by Pops. Pops told him and Delon that they could not sell drugs on Newport

11

and Camden anymore because it was his corner, and he had a gun when he threatened them.  That he never revealed this conversation to the Petitioner and they he did not know that the Petitioner was involved in drugs.

Appellate counsel further argued that the court would not except Petitioner's medical records and the medical evidence the would not admit indicated that Petitioner had a 4 cm laceration on his scrotum and had had stitches and was unable to move and jump as others would have said. (Pages 10-17).

The Court denied the motion and found counsel effective on 8-7-92.

Petitioner's appeal of right was affirmed by the Michigan Court of Appeals in an Unpublished Opinion, per curiam, 8-4-94, No. 137544.

Petitioner filed a Delayed Application for leave to Appeal in the Michigan Supreme Court and was denied on 4-28-95, SC: No. 100792.

On 1-23-96, Petitioner filed a Motion for Relief From Judgment(MCR 6.500), through counsel William Hunter to be heard on 2-9-96.  Petitioner was brought back to the jurisdiction of the Trial Court for the hearing. At the hearing counsel filed a Motion for disqualification of judge, alleging that Judge Leonard Townsend was bias against the Petitioner.  On April 12, 1996, Petitioner appeared before Judge Kym Worthy, Judge Townsend's Alternate, Judge Townsend recused himself from the case.  Petitioner's Motion for Relief from Judgment proceeded before Judge Worthy.  Petitioner had several hearings in Judge Worthy's courtroom, before Counsel for Petitioner filed for a stay from the court to prepare and raise addition issues to support Petitioner's Motion for Relief From Judgment.  Judge Worthy granted the motion and did not stipulate a dead line for Counsel to re-submit the motion.  Petitioner's Motion was pending until re-submission.

Through counsel Antonio Tuddles, Petitioner re-submitted his Motion

for Relief From Judgment and it was filed with the Court May 3, 2004. Petitioner's Motion was properly filed before Judge Worthy's successor, Judge David Allen.(Judge Worthy stepped down from the bench to be come Wayne County Prosecutor).   Petitioner's Motion was then transferred, unbeknownst to Petitioner, back to recused Judge Townsend.

On July 14, 2004, Judge Townsend denied Petitioner's Motion. Petitioner's counsel filed a motion for reconsideration, alleging that Judge Townsend committed plain error by ruling on a case that he earlier recused himself from.   Counsel also filed a motion before the Chief Judge for Disqualification of judge against Judge Townsend, so that he would not compound the error and rule on the Motion for Reconsideration.(That motion has never been answered).   Judge Townsend denied Petitioner's motion for reconsideration on 9-27-04, and ignored the issue of his prior recusal.

Petitioner sought Mandamus action with the Michigan Court of Appeals to vacate the post-recusal order of Judge Townsend.   That Court dismissed Petitioner's Mandamus on 2-10-05, "for lack of jurisdiction seeing as plaintiff may appeal the July 14, 2004, order denying his motion for relief from judgment under MCR 6.500 et seq."

Petitioner timely filed a Delayed Application for Leave to Appeal in the Michigan Court of Appeals.   Petitioner's Application was denied on 3-16-06.

Petitioner timely filed an Application for Leave to Appeal in the Michigan Supreme Court.   Petitioner's Application was denied on 10-31-06. Petitioner filed a timely motion for reconsideration of said order.   It was denied on 1-29-07.

After exhausting state remedies, Petitioner filed a Writ of Certiorari in the United States Supreme Court on 4-23-07.   Certiorari was denied on

13

10-1-07.

Petitioner has exhausted all of his state remedies and now timely files his Habeas Corpus Petition, pursuant to 28 U.S.C.A. Sec. 2254.

ISSUE I

WHEN JUDGE TOWNSEND RECUSED HIMSELF FROM PETITIONER'S CASE, LOSING
JURISDICTION, JUDGE TOWNSEND COULD NOT MAKE ANY SUBSTANTIAL DECISIONS ON
PETITIONER'S CASE AFTER RECUSAL, OTHER THAN MINISTERIAL ACTS NECESSARY TO
TRANSFER THE CASE TO ANOTHER JUDGE. JUDGE TOWNSEND'S OPINION AND ORDER DENYING
PETITIONER'S MOTION FOR RELIEF FROM JUDGMENT AND MOTION FOR RECONSIDERATION
MUST BE VACATED.

28 U.S.C. Sec.455, which governs all judges in the United States, both

sate and federal, was designed to promote public confidence in the

impartiality of the judicial process. The statute places a self-enforcing

obligation upon judges to stand recused where legal grounds exist for

disqualification. Michigan codified Sec. 455 in its Rules of Court, under

chapter 2.300. Judge Townsend's ruling was contrary to clearly established

Supreme Court precedent. See Liljiberg v Health Services Acquisition

Corporation, 486 U.S. 847; 108 S.Ct. 2194, 2203-2205; 100 L.Ed.2d 285 (1988).

In the present case, the judge who originally presided over the trial

and sentencing proceedings, invalidly resumed control over the Petitioner's

case himself. After recusal, the judge entered a final order of denial with

respect to the judgment under attack. The judge violated Sec. 455 and MCR

2.300 when he did so.

In 1996, after completion of direct review, Petitioner filed a Motion

for Relief From Judgment, pursuant to Chapter 6.500 et. seq., of the Michigan

Rules of Court (MCR). Along with this post appellate relief motion,

Petitioner filed a separate motion to disqualify the original judge who

presided over the case, Judge Leonard Townsend. In response to Petitioner's

motion to disqualify, judge Townsend acknowledged bias, and recused himself

from the case. The Petitioner's case was then transferred to another judge,

Judge Kym Worthy. This Transfer was noted in subsequent evidentiary hearing

held by Judge Worthy regarding Petitioner's claims of ineffective assistance

of counsel contained in his post judgment motion:

15

The Court (Judge Worthy): I'm sorry Mr. Hunter.

Mr. Hunter (Attorney for Petitioner): Good morning.  For the
record, my name is William Hunter, P-30911, appearing on behalf
of Tommie Seymore.  Your Honor, this is -- originally we had
filed a motion to disqualify along with post judgment relief
motion which has six issues.  The motion to disqualify has
been remedied mute by the fact of the transfer.
(See Exhibit   , Hearing Transcripts, 4-12-96, pg 8)

On September 27, 1996, Defense Attorney William Hunter motioned the

court to hold the defendant's motion in abeyance in order to draft other

issues.

Petitioner latter resubmitted his motion under 6.500 et. seq. in 2004.

The motion fell before Judge David Allen, the successor who replaced Judge

Worthy, who had recently stepped down from the bench to become Wayne County

Prosecutor.  Somehow, however, the motion returned before Judge Townsend,

who subsequently disposed of it on July 14, 2004.

Taken aback by Judge Townsend's post-recusal ruling, Petitioner filed

a motion for reconsideration, arguing, inter alia, that Judge Townsend

committed clear and palpable error in disposing of his post-appellate motion

after having had previously recused himself from the case.  Remarkably, Judge

Townsend also ruled upon the reconsideration ignoring Petitioner's issue

against him, and denied the reconsideration.

Following this, Petitioner sought Mandamus with Michigan Court of Appeals

to correct the jurisdictional defect of Judge Townsend's post-recusal entrance

of an order disposing of his post-appellate motion.  Under federal and state

jurisprudence, mandamus was the proper remedy to vacate post-recusal orders

by judges previously recused. Tommie Lee Syemore v Leonard Townsend, 3rd

Circuit Judicial Court Judge, Docket No. 259843 (2004).  However, the Michigan

Court of Appeals rejected Petitioner's Mandamus action, stating that:

The Complaint for a writ of mandamus, which is in actuality
a complaint for writ of superintending control, per MCR

3.302(C), is DISMISSED for lack of jurisdiction seeing as plaintiff may appeal the July 14, 2004, order denying his motion for relief from judgment under MCR 6.500 et seq. MCR 3.302(D)(2), 7.203(C)(1), and 7.206(B). If plaintiff wants to challenge the July 2004 order, he must file a delayed application for leave to appeal under MCR 7.205. See MCR 7.203(B)(1).

Adhering to the court's instructions, the Petitioner timely filed an application for delayed appeal, raising the challenge to Judge Townsend's post-recusal order. However, the court, under the pretenses that his jurisdictional challenge was directed at some issue underlying his conviction and sentence, and was, thus, subject to the rigors of MCR 6.508(D)(i.e., that he must overcome procedural default by satisfying good cause and actual prejudice), denied the application on that ground without addressing the actual challenge to Judge Townsend's invalid post-recusal order. See <u>People of the State of Michigan</u> v <u>Tommie Lee Seymore</u>, Docket Number 262724, 3-16-06.)

Next, the Petitioner presented his challenge of Judge Townsend's post recusal order denying his motion for relief from judgment to the Michigan Supreme Court for discretionary review. The Michigan supreme Court denied the application on the same erroneous grounds as the Michigan Court of Appeals did on October 31, 2006, finding that the petitioner, ". . . failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)." Petitioner filed for reconsideration in the Michigan Supreme Court that was denied January 29, 2007.

On April 23, 2007, Petitioner filed a Writ of Certiorari in the United States Supreme Court. That court Denied the petition for Certiorari on October 1, 2007.

The question of whether Sec. 455 applies to bar a judge from entering post-recusal orders is one of great importance to the public's perception

17

of the judiciary across the nation. The Supreme Court has stated that what is fundamental to the judiciary is public confidence in the impartiality of judges and the proceedings over which they preside. See In re Murchinson, 349 U.S. 133, 136; 75 S. Ct. 623; 99 L.Ed. 942 (1954)("Justice must satisfy the appearance of judice."). Accordingly, Sec. 455 was designed "to promote confidence in the judiciary, by avoiding even the appearance of impropriety whenever possible." Liljiberg v Health Services Acquisition Corporation, 486 U.S. 847; 108 S. Ct. 2194, 2203-2205; 100 L.ED.2d 285 (1988).

Both state and federal courts have almost uniformly held that a judge who recused himself should take no further action in the case, execpt the necessary ministerial act to have the case transferred to another judge. El Fenix de Puerto Rico v The M/Y Johanny, 36 F.3d 136, 144 (1st Cir. 1994)(a trial judge who has recused himself should take no further action in the case); United States v Lauerson, 348 F.3d 329, 388 (2nd Cir. 2003); Rohrbach v At & T Nassau Metals Corp., 915 F.Supp 712 (M.D. Pa. 1996)(same) Anorld v Eastern Air Lines, Inc., 712 F.2d 899, 904 (4th Cir. 1983)(same); Doddy v OXY USA, Inc., 101 F.3d 448 (5th Cir. 1996),(same, but also listing state cases); Grutter v Bollinger, 16 F.Supp.2d 797 (E.D. Mich 1998)(once chief judge disqualifies herself from hearing university's motion to have action challenging its admissions policies reassigned to judge hearing similar action, she was duty-bound to refrain from taking any further action in the matter); United States v Hively, 291 F.Supp.2d 858 (E.D. Ark. 2003)(recused judge is barred from entering nunc pro tunc order); In re South Corp., 334 F.3d 941 (11th Cir. 2003)(recused judge's actions are limited to "house keeping orders" that do not involve exercise of judicial discretion); Liberty Lobby, Inc., v Dow Jones & Co., Inc., 838 F.2d 1287 (C.A.D.C. 1988)(recusal of judge has prospective effect on his actions.). This is so, because a

judge who acknowledges that his partiality could be reasonably questioned, is consequently stripped of his power to perform judicial actions thereafter over the case. See Moody v Simmons, 858 F.2d 137, 143 (3rd Cir. 1988), cert denied, 489 U.S. 1078; 109 S. Ct. 1529; 103 L.Ed.2d 835 (1989). Whatever actions are taken by a judge in defiance of a prior recusal order is void for want of jurisdiction, Rohrback v At & T Nassau Metals Corp.., 915 F.Supp 712 (M.D. Pa. 1996)(a judge after having decided to recuse himself, lacks jurisdiction to decide question of vacatur), and the only remedy in such a case is to vacate any order entered after recusal. See Republic of Panama v America Tobacco Co. Inc., 217 F.3d 343 (5th Cir. 2000)(any order entered following disposition of a recusal motion must be vacated). For, vacation of an order issued by a recused judge is what will restore public confidence in the legal system. See United States v Jordan, 49 F.3d 152, 155 (5th Cir. 1995)

Normally, nothing prohibits a judge from reconsidering a recusal decision, considering that any interlocutory ruling can be reconsidered. See Lauerson, 348 F.3d at 338. But once the case has already been transferred prior to entry of a final judgment, the judge is barred from reconsideration of a prior decision. This rule holds true even if the recusal order was improvidently entered. See El Fenix de Puerto Rico, 36 F.3d at 141–142.

In this case, Judge Townsand should have stood recused on the matter, and not resume control over the case to decide the merits of Petitioner's post–appellate motion. Although, MCR 6.504 required that Petitioner's motion be presented to Townsend, the judge who was assigned the case at the time of the conviction, that rule also contains another provision requiring reassignment of the motion to another judge, if the appropriate judge is not available. Disqualification for bias rendered Townsend unavailable to

decide the motion.

The proper procedure for Townsend to follow in such a case of disqualification was MCR 8.111(A)(C), which governs reassignments of cases.

Townsend further compounded his error by also ruling upon Petitioner's reconsideration motion. Where Judge Townsend failed to address the first issue of Petitioner's reconsideration motion, claiming that judge Townsend recused himself prior to ruling on Petitioner's post-appellate motion and violated 28 U.S.C. Sec. 455. and MCR 2.003.

His resumption of control over Petitioner's case constitutes either defiance or reconsideration of his prior disqualification. Yet, Townsend stated nothing on record to justify his actions in hearing the motion. Nevertheless, bother judicial acts should be considered void for want of jurisdiction. See R. Flamm, Judicial Disqualification, Sec. 22.41 ("When a judge presumes to take substantive action in a case, despite having recused himself from it . . . any such action is often considered a nullity, and any orders issued by such a judge are considered absolutely void for want of jurisdiction.")

The Supreme Court has suggested that the harmless error rule applies regarding Se. 455 violations. See Liljeberg, 486 U.S. at 862 (noting that there is surely room for harmless error committed by busy judges who inadvertently overlook a disqualifying circumstances.) Based on this suggestion, the lower courts have applied the harmless error rule in the context of post-recusal judicial actions. See e.g., United States v O'Keefe, 128 F.3d 885, 892 (5th Cir. 1997) In Liljeberg, that Court established that the following factors must be considered when determining whether vacation of a judge's post-recusal order is mandated: (1) the risk of injustice to the parties in this case, (2) the risk that denial of relief will create

20

injustice in other cases, and (3) the risk of undermining the public's confidence in the judicial process." Id., 486 U.S. at 864.

The error in this case was not harmless, Townsend's decisions denying Petitioner's motions for relief from judgment and reconsideration must be vacated.

Allowing Townsend's post-recusal decisions over Petitioner's case to stand poses a risk of injustice to the Petitioner. Townsend has already determined himself to be biased towards Petitioner's criminal case, and found himself worthy of disqualification. And, Townsend made this determination nearly ten years after Petitioner's conviction. So, any actions soon after Townsend's disqualification, and after the case has been transferred, can only been deemed based on bias. Petitioner has a constitutional entitlement to an unbiased adjudication.

There is also a risk that refusal to vacate Townsend's post-recusal orders in this case would create injustice in other cases. Without a decision in the affirmative of Petitioner's argument, there is nothing to stand in the way of other judges to act in defiance of recusal orders and arbitrarily resume control over a case towards which they have been deemed biased. Nor is there any uniform rule in place in Michigan to ensure that further parties receive fair and impartial treatment in a proceeding after the original judge has been recused.

Public confidence in the judicial process will be undermined if this Court holds Townsend's post-recusal violations to be harmless error, Michigan courts are currently struggling to resolve their own internal dispute with basic recusal issues. See e.g., Adair v State of Michigan, 474 Mich 1027 (2006). Townsend's violations are symptomatic of a judiciary that is losing the public's confidence in it's ability to be fair and impartial. Refusal

21

to vacate in this case runs the risk that all public confidence in the Michigan judiciary will be lost.

This Court should vacate Judge Townsend's post-recusal adjudication where Michigan higher Court's failure to enforce 28 U.S.C. Sec. 455 upon circuit court judge Leonard Townsend's post-recusal adjudication denying Petitioner's post-appellate motion for relief from judgment, which is contrary to clearly established Supreme Court precedent and violating Sec. 455, regarding recusal, according to this Court; the United States Court of Appeals and the United States Supreme Court.

ISSUE II

PETITIONER'S CONVICTION MUST BE REVERSED AND A NEW TRIAL GRANTED WHERE THE TRIAL COURT ABUSED IT'S DISCRETION BY FAILING TO PROPERLY HOLD A "REMMER HEARING" ON JURY TAMPERING TO ALLOW THE DEFENDANT AN OPPORTUNITY TO ESTABLISH ACTUAL BIAS RESULTING FROM JURY TAMPERING, WHERE ON TWO SEPARATE OCCASIONS FIVE JURY MEMBERS WERE APPROACHED ON BEHALF OF THE DEFENDANT, DEPRIVING DEFENDANT OF HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL BY IMPARTIAL JURORS.

The Defendant contends that, once it was revealed that there was jury tampering, it was the duty of the Trial Court to hold a "Remmer Hearing," pursuant to Remmer v United States, 347 U.S. 227; 74 S.Ct. 450; 98 L.Ed. 645 (1956), to investigate the matter of the jury tampering to ensure that the presiding jury was going to be impartial to the Petitioner after being approached and threatened on his behalf. The Petitioner also contends that the burden of proof rest upon a defendant to demonstrate that unauthorized communications with jurors resulted in actual juror partiality. Therefore, Petitioner must be given the opportunity to prove juror bias. Nevers v Killinger, 169 F.3d 352 (1999); Smith v Phillips, 455 U.S. 209; 102 S.Ct. 904, at 945; 71 L.Ed.2d 78 (1982).

The Trial Court failure to hold a "Remmer Hearing" on jury tampering to ensure their impartiality and give Petitioner an opportunity to establish jury bias, prevented Petitioner from demonstrating with specificity that the jury tampering did in fact impair the ability of the jury to decide the case solely on the evidence properly presented to them through the mechanism of the trial. See United States v Pennell, 737 F.2d 521 (1984).

In the present case, five jurors were approached on behalf of the Petitioner. One in the Court vestibule and four in the Court house parking lot. The unidentified man in both instances approached the jurors and stated, don't send my boys to prison their innocent. Two of the jurors came out of the jury room, juror No. 13 and 10, one from each incident, and brought the threat to the attention to the judge. It was found that the same was said to three other jurors, jurors No. 5, 6, and 2, that was with juror No.

23

10, so the court sent juror No. 10, back into the jury room to bring out the other three.

It is not known if the five jurors notified their counterparts, this question was never asked and when the court was asked to question the other jurors to see if they heard anything about the tampering, the court took it upon it's self to say that the five jurors said that they never said anything to the other jurors – even though they never said they did not discuss what transpired with the other jurors – and to say something to them would just be spreading it around. (TT, 12-10-90, pg. 3-6). All five jurors answered a few questions at the bench outside the presence of the other jurors and the Petitioner, (Petitioner's Co-Defendant was allowed to be present), but never questioned them individually. The Court asked them would being approached like that make a difference, not once did the Court ask them could they remain impartial and could they render a verdict based upon the evidence and the court's instruction. Three jurors said that it would not affect them, 6, 5, and 2, juror No. 13 said that she did not appreciate being approached like that, that it did not make a difference to her and juror No. 10 remained silent. The court then ordered the jurors back to the jury room without instructions not to discuss being threatened and being questioned by the court with the other jurors. The court did not summon the entire jury, like counsel requested, and ask a series of questions designed to elicit whether any juror's impartiality had been compromised and could they remain impartial and could they render a verdict based upon the evidence and the court's instruction, unlike _Pennell_. If the unidentified man was brazen enough to threaten five jurors on two separate occasions, whose to say he didn't approach one of the remaining eight jurors, who may have been afraid to come forward. Accordingly, unlike _Pennell_, the present case requires

24

a reversal.

Petitioner raised the present issue in his Relief From Judgment Motion, the Petitioner clearly showed the Court that a constitutional reversible error had been committed, and that Remmer was the starting point when allegation are made and a hearing must be held during which the Petitioner is entitled to be heard. Phillips, supra at 455 U.S. 209, at 215; 102 S.Ct. 940, at 945. The trial Court chose to ignore the precedent set forth by the United States Supreme Court and the 6th Circuit.

The trial Court in its' ruling failed to address the fact that the Petitioner must be given an opportunity to prove actual bias, and failed to address the four part test that emerged from Pennell, supra. Instead the Court found that it's side bar at the bench (absent the Petitioner) with the five jurors was sufficient — going against clearly established Supreme Court precedent.

The side bar at the bench was not like that in Pennell; in Pennell five jurors received anonymous telephone calls. In all five instances, the caller urged the juror to convict and quickly hung up. The five jurors notified their counterparts of what happened and then notified the court. The court proceeded individually to question the five jurors who had received calls out of the presence of the other jurors. All five stated that their impartiality had not been compromised. The court then summoned the entire jury and asked a series of questions designed to elicit whether any juror's impartiality had been compromised and whether any juror would find it difficult to render a verdict based upon the evidence and the court's instruction. No jurors responded, the court then ordered the jury to resume deliberations.

The steps taken in Pennell to insure juror impartiality were not taken

25

in the present case, the court never asked did they notify their counterparts of what happened, the court did not question the five jurors individually, the court did not summon the entire jury and ask questions designed to elicit whether any jurors impartiality had been compromised, the court did not ask the jurors could they reach a verdict based upon the evidence and the court's instruction, and the court never informed the jurors not to discuss being threatened with the rest of the jury.

Furthering the injustice, the trial court further held that Remmer does not dictate that a full hearing be held in all suspected tampering cases. That the side bar was sufficient. In U.S. v Rigsby, 45 F.3d 120 (6th Cir. 1998), that court stated that a "Remmer hearing is required in all cases involving unauthorized communication of juror with outside source that presented likelihood of affecting the verdict." Like the present case.

Furthermore, in a criminal case involving jury tampering, Remmer does dictate that a hearing must be held during which the defendant is entitled to be heard and have the opportunity to prove actual bias, this was not done, the Petitioner was not present in the courtroom, but his co-defendant was, leaving the jurors to inquire about his absence and draw negative inferences about his absence. See United States v Chiantese, 582 F.2d 974 (1978); U.S. v Walker, 1 F.3d 423 (6th Cir. 1993); U.S. v Dutkel, 192 F.3d 893 (9th Cir. 1999); U.S. v Zelinka, 862 F.2d 92 (6th Cir. 1988)(Spectator at trial made comments in presence of jurors on courthouse elevator that jurors considered threatening); Smith v Phillips, supra; Pennell, supra, (five jurors contacted at home during period of deliberations by anonymous telephone caller who made threatening statements); U.S. v Rugiero, 20 F.3d 1387 (6th Cir.)(jurors became aware during deliberations of TV broadcast linking defense counsel to organized crime) cert denied, ___ U.S. ___; 115 S.Ct. 208; 130 L.Ed.2d

26

137 (1994).   In these and similar cases the 6th Circuit have held that the allegations of impropriety required a full evidentiary hearing by the trial court. See Rigsby, supra.

In Zelinka, supra at 95-96, the issue was reviewed:

> This Court has consistently held that Smith v Phillips reinterpreted Remmer to shift the burden of showing bias to the defendant rather than placing a heavy burden on the government to show that an unauthorized contact was harmless. In United States v Pennell, 737 F.2d 521, 532 (6th Cir. 1984), cert. denied, 469 U.S. 1158; 105 S.Ct. 906; 83 L.Ed.2d 921 (1985), this court interpreted Smith v Phillips as holding that "Remmer" does not govern the question of burden of proof where potential jury partiality is alleged. Instead, Remmer only controls the question of how the district court should proceed where such allegations are made . . . .   In light of Phillips, this burden of proof rests upon a defendant to demonstrate that unauthorized communications whit jurors resulted in actual partiality. . . . Other courts continue to apply Remmer as if Smith v Phillips made no change in the burden of proof. Nevertheless, Pennell remains the controlling decision in this circuit.
> The court in, Pennell also noted the Supreme Court's rejection in Smith v Phillips of the idea that a juror's testimony about her own impartiality is inherently suspect. 737 F.2d at 533. Four points emerged from our decision in Pennell: (1) when a defendant alleges that an unauthorized contact with a juror has tainted a trial, a hearing must be held; (2) no presumption of prejudice arises from such a contact; (3) the defendant bears the burden of proving actual juror bias; and (4) juror testimony at the "Remmer Hearing" is not inherently suspect. 862 F.2d at 95-96.

The court ruled that the Petitioner MUST be given an opportunity to prove actual jury bias and when a defendant alleges such a violation as jury tampering, the defendant MUST be given an opportunity to prove actual juror bias as stated in Pennell, because the burden of showing actual bias is upon the Petitioner.   Also the four point system that emerged in Pennell must be followed.

Petitioner's rights were trampled upon further when at the side bar counsel requested for the rest of the jury to be called out, but was denied by the court. (T.T., 12-10-90, pg. 3-6).   See Walker, supra, at 431.   "By

27

denying the reasonable request to inquire into the juror's states of mind, the defendants were deprived of the opportunity to meet their burden of proving actual juror bias, and were thereby denied a fair trial." See also, <u>Dennis</u> v <u>United States</u>, 399 U.S. 162; 70 S.Ct. 519; 94 L.Ed 734 (1950)("**preservation of the opportunity to prove actual bias is a <u>guarantee</u> of a defendant's right to an impartial jury**").

The Petitioner did not receive the <u>**guaranteed**</u> opportunity to prove actual jury bias, nor was Petitioner given the opportunity to prove that he had nothing to do with the jury tampering, or explain his absence and his co-defendant's presence in the courtroom. see <u>U.S.</u> v <u>Corrado</u>, 304 F.3d 593 (6th Cir. 2002)(where the jury was tampered with on behalf of the defendants, but they knew nothing about it.)

The Damage was done and to what extent needed to be known to protect the Petitioner's right to a fair trial by an impartial jury. "It is the communication's potential to impact upon a juror's ability to perform his or her duties impartially, rather than the form or source of the communication, that dictates the necessity for conducting a <u>Remmer hearing</u>," <u>Walker</u>, supra.

It was required that the Trial Court hold a <u>Remmer Hearing</u>, <u>Phillips</u>, supra, to give the Petitioner the opportunity to prove that at least one of the jurors were bias. Had Petitioner been afforded a <u>Remmer Hearing</u>, he is more than confident that it could have been proven that at least one or more of the jurors were bias. When the trial Court asked juror No. 13, the vague question, is this going to make a difference to you, she responded, "I don't appreciate being approached like that." (TT IV, 12/10/90, pg. 3-6). It is believed that this juror brought a male escort to court with her after she was approached.(Motion for New Trial, 2/8/91, pg.17)   And Juror

No. 10, was silent.

The judge made the decision <u>ex parte</u> that the jurors could render an impartial decision without confirmation from the jurors. He never asked them, the five, could they be impartial and he did not hold a hearing to see the extent of the jury tampering and he did not inquire into the extent of how many jurors knew about the tampering – did the five tell the remaining eight? nor did he ask the remaining jurors could they be impartial.

> "The trial court should not decide and take final action <u>ex parte</u> on information such as was received in this case, but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." <u>Remmer</u>, supra.

See Also <u>U.S.</u> v <u>Hall</u>, 85 F.3d 367 (8th Cir. 1996)(What concerns us most is the court's failure to explore the nature of the jury's exposure to extraneous, prejudicial information beyond what a single affidavit recounts. Therefore, we remand the matter to district court to make a full factual inquiry. Once the court has a complete picture of what events transpired, it may, of course, grant a new trial based on the taint of even a single juror.); <u>United States</u> v <u>Hendrix</u>, 549 F.2d 1225 (1977)(If only one juror is unduly biased or prejudiced or improperly influenced, the criminal defendant is denied his Sixth Amendment right to an impartial panel.); See also, <u>Dyer</u> v <u>Calderon</u>, 113 F.3d 927 (9th Cir. 1997); <u>United States</u> v <u>Delaney</u>, 732 F.2d 639, 643 (8th Cir. 1984).

### THE SIDE BAR AT THE BENCH WAS NOT AN ADEQUATE HEARING

The trial court in it's ruling denying the Petitioner's Motion for Relief From Judgment stating that the side bar conference was adequate. Petitioner assert that the side bar that was held between the Trial Court, the five jurors, defense counsel and the prosecution, could not be considered a <u>Remmer</u> <u>Hearing</u>. To do so would be contrary to clearly established Supreme Court

29

precedent.

In U.S. v Corrado, 304 F.3d 593 (6th Cir. 2002), a Remmer hearing, was held and the nature of the hearing was described by the Sixth Circuit:

> "we remanded for Remmer hearing, providing specific instructions to district court with respect to the nature of that hearing on remand:
>
> At this hearing, the defendants should be accorded the opportunity to question the jurors individually and **under oath** about the extent of their interaction, if any, with Kennedy. The defendants should also be permitted to investigate the impact, if any, of the news reports describing Shabazz's arrest that were issued on the weekend before the jury began its deliberation.

The nature of the Remmer Hearing, as in all hearings, require testimony, those giving testimony must be sworn in under oath as witnesses, not jurors. See United States v Davis, 177 F.3d 552, 556-57 (1999)("At this hearing, the defendants should be accorded the opportunity to question the jurors individually an under oath about the extent of their interaction,")

In the present case, the jurors were not under oath as witnesses. Secondly, Petitioner was not allowed to question the jurors individually, defense counsel was not allowed to probe and question effectively the five jurors at the bench about the extent of their interaction with the unidentified man, nor was he allowed to question the remaining eight jurors.(per the judges orders, fearing that he might be spreading it. Inadvertently admitting not knowing the extent of the tampering)(T.T. IV, 12/10/90, pg 3-6) Third, the Petitioner was not present, but his co-defendant was. Fourth, the remaining eight jurors were not questioned at all, regardless of how brazen the unidentified man was.

The extent of the jury tampering could not be exposed in an improper side bar at the judge's bench. The side bar could not be the proper remedy for jury tampering, when the proper remedy has been defined in Pennell, supra,

according to the United States Supreme Court in <u>Remmer</u>, supra, and <u>Phillips</u>, supra.

Also, it would be ridiculous to say the other jurors were not informed as to why the five jurors were being called out, when the jury was never instructed not to discuss the case, especially when Juror No. 10 had to go back into the jury room to bring out Jurors No. 6, 5, and 2. A proper <u>Remmer</u> <u>Hearing</u> was necessary to determine the extent of the jury tampering. Therefore, counsel moved for a mistrial before deliberations. The Defendant has a Due Process right to have a factual determination made regarding the effect of the jury tampering on the jury. <u>Killinger</u>, supra. Without a hearing, there is simply no way to gauge whether or to what extent the jury was tampered. <u>Davis</u>, supra. Without the hearing, Petitioner was not given the chance to prove juror bias.

This violation of Petitioner's rights alone is serious enough to constitute a miscarriage of justice and a New Trial is required.

ISSUE III

PETITIONER'S CONVICTION MUST BE REVERSED AND A NEW TRIAL GRANTED WHERE THE
TRIAL COURT ALLOWED THE JURY TO DISCUSS THE CASE AMONG THEMSELVES WITHOUT
THE BENEFIT OF COUNSEL'S ARGUMENTS AND GUIDANCE OF THE LAW, BY FAILING TO
GIVE CAUTIONARY INSTRUCTION CJ$2d 2.12, THROUGHOUT THE ENTIRE TRIAL, THEREBY
ALLOWING THE JURORS TO DELIBERATE ON THE CASE AS THE TRIAL WENT ALONG, INSIDE
AND OUTSIDE THE JURY ROOM, AMONG THEMSELVES, AND DISCUSS THE CASE WITH FAMILY,
AND FRIENDS, DEPRIVING THE PETITIONER OF FAIR TRIAL BY A PANEL OF IMPARTIAL,
INDIFFERENT JURORS, IN VIOLATION OF THE PETITIONER'S DUE PROCESS.

The Sixth Amendment guarantees every defendant in a criminal prosecution
the right to trial by an "impartial jury." Any discussion among jurors of
a case prior to formal deliberations certainly endangers that jury's
impartiality. United States v Edwards, 696 F.2d 1277 (11th Cir. 1983);
Winebrenner v United States, 147 F.2d 322 (8th Cir.), cert. denied, 325 U.S.
863; 65 S.Ct. 1197; 89 L.Ed. 1983 (1945). Such conversations may lead jurors
to form an opinion as to the defendant's guilt or innocence before they have
heard all of the evidence, the arguments of counsel, and the court's
instructions. Winebrenner, 147 F.2d at 328; see also United States v
Chiantese, 582 582 F.2d 974, 979 (5th Cir. 1978), cert. denied, 441 U.S.
922; 99 S.Ct. 2030; 60 L.Ed.2d 395 (1979). The right to a jury trial
guarantees to the criminally accused a fair trial by a panel of impartial,
indifferent jurors. The failure to accord an accuse a fair hearing violates
even the minimal standards of due process. Tuner v Louisiana, 379 U.S. 466;
85 S.Ct. 546; 19 L.Ed.2d 424, 428 (1965). Without reading CJI2d 2.12, the
jurors were allowed to discuss and deliberate on the case from it's inception
until it's conclusion, violating Petitioner's Due Process.

In People v Hunter, 370 Mich 262; 121 NW2d 442 (1963), the Michigan
Supreme Court fully and carefully considered this issue:

> "It seems to us clear beyond any doubt that jurors should not
> be encouraged to discuss evidence they have heard and seen
> during the course of trial until all of the evidence has been
> introduced, the arguments to the jury made, and jury charged
> by the court but that, rather, juries should be directed by
> the court not to do so until ready to deliberate upon their
> verdict at the conclusion of the trial. This matter has been

fully and carefully considered by the circuit court of appeals for the eight circuit in <u>Winebrenner</u> v <u>United States</u>, 147 F.2d 322. We quote therefrom, with approval (pp 327-329):

*         *         *

". . .If however, the jurors may discuss the case among themselves, either in groups of less than entire juror, or with the entire jury, they are giving premature consideration to the evidence. By due process of the law is meant 'a law which hears before it condemns; which proceeds upon inquiry, and renders judgment only after trial.' The jury should not discuss the case among themselves because, first, they have not heard all of the evidence; secondly, they have not heard the instruction of the court to how this evidence is to be considered by them, and neither have they heard the arguments of counsel.

*         *         *

"'Defendants were entitled to have their case considered by all of the jurors as a jury. Here, without instructions as to the law, without hearing all the testimony, and without hearing argument of counsel, they were authorized to divide themselves into separate groups and distinct deliberative bodies. So general is the rule that jurors should not discuss a case prior to it's submission to them, that it has been enacted into statute in practically all the States of the Union. Of course, the local State statute can have no bearing on the question of procedure in a criminal case tried in Federal court, but the fact that such statutes have so generally been adopted is significant as indicating the generally accepted principle that it is improper for jurors to discuss a case prior to its submission to them. The State statutes are but codification of common-law practice that has prevailed as a part of our jurisprudence for more than a century and a half. Thus, in <u>Shippy</u> v <u>Peninsula Rapid Transit Co.,</u> 197 Cal 290, 294 (240 P 787), that court said:
"'It is the long-established right of both of the parties thereto to have an opportunity to argue the cause and to have the jury after such arguments instructed by the judge of the court as to the law of the case; and it was equally the duty of the jury under the admonition of the court not to form or express an opinion with respect to the merits of either the facts or the law of the case until the case should be finally submitted to them.'

In Michigan the <u>Mandatory</u> Court Jury Instruction (CJI) for the jury not to discuss the case until all the proofs are in is CJI2d 2.12. Petitioner contends that the trial court's failure to give CJI2d 2.12 during Petitioner's entire trial - allowed the jury to discuss and deliberate the case as the

33

case went along without the guidance of the court's instructions on the law and counsel's arguments, inside and outside the courtroom with family and friends and among themselves, thus creating a structural error.

Further, the trial court confirmed in it's denial of Petitioner's Motion For Relief From Judgment, not giving CJI2d 2.12 at Petitioner's trial, calling it "regrettable," violating the Petitioner's right to an impartial jury and Due Process of the Law, but failed to take the appropriate action and grant the Petitioner a new trial.(See Motion for Relief From Judgment Opinion and Order, 7/14/04, page 6)

The Court after conceding to the stupendous error of not giving CJI2d 2.12 attempted to side step the issue at hand and chose to say that the Petitioner relied heavily upon the fact that the juror brought an "escort to court after being approached in a happenstance manner is concrete evidence that this juror decided the case with family or friends." The Petitioner's reliance is not upon the jurors escort, but upon the fact that the mandatory jury instruction was not given, which the trial court admitted not giving. The Petitioner's contention was and still is that he was denied his right to a fair trial by impartial jurors who were not instructed by the court to not discuss the case, depriving the Petitioner his Constitutional Rights.

The aforementioned jury instruction was especially required due to the compounded insult to the integrity of the trial with the jury tampering circumstances that occurred showing prejudice to the Petitioner: Two jury members approached the Judge's bench at the same time concerning two separate incidents where someone approached them stating, "Donts find my boys guilty."(TT IV, 12/10/90, pg 3). One incident occurred in the parking lot of the Courthouse and the second incident was in the Courthouse vestibule.(TT IV, 12/12/90, pg 3).

34

It is not mere speculation to say, that before the juror members approached the bench they discussed whether or not to approach the bench and bring this incident to the Trial Court's attention with the other jurors. This is evident due to the fact that four jurors were present during one incident in the parking lot, Jurors No. 2, 5, 6, and 10, but only one of the four – their representative, Juror No. 10 – approached the bench with the other juror that had been approached separately, Juror No. 13.(TT IV, 12/10/90, pg 3). See People v Monroe, 85 Mich App 110, 113, fn.2; 270 NW2d 655 (1978); People v Blondia, 69 Mich App 554; 245 NW2d 130 (1979)(the Appellate Court assumed that having been invited to do so the jurors did in fact discuss testimony during the course of the trial. Where, as during trial, we consider the assumption sound.)

During the side bar at the bench, the jurors were never asked did they discuss what happened to them with their family or the rest of the jury members. The five members should have been instructed not to discuss what transpired at the bench and with the unidentified person with the rest of the jury or anyone.

The judge made the following statement: "The Court: (interposing) all we're doing is spreading it around. They said they didn't discuss it with anyone. They did what they were told to do and it doesn't make any difference to them." (TT IV, 12/10/90, pg 4).

The above statement is without support and it is the only statement by the trial court concerning discussing what happened to the jurors with anyone, including the other jury members that were not called out of the jury room. Nowhere in the trial transcripts did the jury members say that they did not discuss the case with anyone, nor did the trial court instruct the jury members not to discuss what transpired with the rest of the jury.

35

Monroe, supra.

When all of the above factors are added together, overwhelming prejudice is visited upon the Petitioner. The no-discuss instruction was necessary to ensure Petitioner's Due Process Rights to a fair trial and impartial jury were not violated. By Due Process of the law is meant "a law which hears before it condemns; which proceeds upon inquiry, and renders judgment only after trial."

After the incident happened with the jurors, one of the jurors brought a male escort to Court the following day. This male escort was permitted to use the jury exit along with the jurors. (Affidavits of: Kimberly Seymore, Kathy Blackshear. Also Motion for New trial Transcripts, 2/8/91, pages 17-18). In order for a civilian to use this elevator, they must have permission from the court, therefore something was told to the court to allow this person to travel along with the jury, this at least indicated that one of the jurors did discuss the jury tampering with family and friends, and possibly further with the judge, in violation of CJI2d 2.12, of which was never given.

It was not a happenstance meeting between the juror and the person that threatened her as the trial court stated, this person sought her out and four other jury members that we know about, on two separate occasions. There was nothing happenstance about his approach and threats. To protect the Petitioners right to a fair trial by impartial jurors, it was the courts duty to instruct the jury not to discus the case, or the jury tampering.

Prejudice should be presumed in the Petitioner's case, considering the court never told the jury that they could not discuss the case as the trial went along, compounded with five of the twelve jurors, were never instructed not to discuss the conversation that they had with the court concerning being approached on behalf of the Petitioner, or the conversation they had with

36

the unidentified man, no instruction was given at the beginning of trial informing the entire jury that they could not deliberate or discuss the case as the case went along with each other, family or friends.

Therefore, Petitioner contends that without CJI2d 2.12, the jurors were allowed to deliberate on the case as the case went along and discuss the present case with anyone from the moment they became official jurors of the case. This "structural error" compounded once jury tampering transpired. Without the "no-discuss" instruction, they were allowed to deliberate on the case as the case went along and discuss the case with family and friends through the trial, plus five were allowed to discuss being threatened on behalf of the defendant with the remaining eight jurors and it cannot be said that they did not deliberate on the case as the case went along or discuss the case and what transpired during the case with each other or friends and family, because they were never told not to. Like in <u>Hunter</u> and <u>Monroe</u>, supra, Petitioner's due process was violate and he was deprived of a fair trial by impartial jurors. Petitioner request that his conviction be reversed and a New trial granted. For this irregularity was so offensive to the maintenance of sound judicial process, the Petitioner's conviction should not be allowed to stand.

ISSUE IV

PETITIONER'S ABSENCE DURING A CRITICAL HEARING DENIED HIM OF HIS
CONSTITUTIONAL RIGHTS AND WARRANT REVERSAL OF HIS CONVECTION.

A defendant has a right to be present during the vior dire, selection
and challenge to the jury, presentation of evidence, arguments of counsel,
jury instruction, rendition of the verdict, imposition of sentence and any
other stage of trial where the defendant's substantial rights might be
adversely affected. Granted, neither the Federal or State Constitutional
have an express provision guaranteeing the accused the to be personally
present at his trial. This right to be present is impliedly guaranteed by
the Confrontation Clause, U.S. Const. XIV; Mich Const. 1963, Art. 1, Sec.
20; the Due Process Clause, U.S. Const. XIV; Mich Const. 1963, Art. 1, Sec.
17, and the right to an impartial jury. U.S. Const. VI; Mich Const. 1963,
Art. 1, Sec. 20.

One of the most basic of rights guaranteed by the confrontation clause
of the Sixth Amendment is the accused right to be present in the courtroom
at every stage of his trial. U.S.C.A. Const. Amends VI, XIV. See Illinios
v Allen, 397 U.S. 337; 90 S.Ct. 1057 (1970); Black v Goord, 419 F.Supp.2d
373 (WDNY 2006); U.S. v Watson, 479 F.3d 612 (8th Cir. 2007); U.S. v Berger,
472 F.3d 1094 (9th Cir. 2007).

In Snyder v Massachusetts, 291 U.S. 97; 54 S.Ct. 330; 78 L.Ed 674 (1934),
the United States Supreme Court held that the presence of a defendant at
trial is required by the Due Process Clause to the extent that a fair and
just hearing would be thwarted by his absence. Id. pp. 107-108. See People
v Mallory, 421 Mich 229, 247 (1984).

In Hopt v Utah, 110 U.S. 574; 28 L.Ed 262; 4 S.Ct. 202 (1884) the Supreme
Court held the defendant's absence during a hearing was a violation of the
Due Process Clause. After the defendant had challenged six prospective jurors
for cause, the six individuals were taken from the courtroom into a different

38

room.   There   the   persons   were   examined   and   challenges   were   tried   in   the defendant's absence.   The trial Court rejected all six challenges for cause.

The Supreme Court relied upon the Territory of Utah's statute requiring that where a defendant is tried for a felony he must be 'personally present' at the trial.   The Court noted that the statute deemed it essential to the protection of one whose life or liberty was involved in a felony prosecution to be present at ever stage of the trial when his substantial rights might be affected.   Michigan has a similar statute, MCLA 768.3; MSA 28.1026, which affords a defendant this specific right:

> "No   person   indicted   for   a   felony   shall   be   tried   unless
> personally present during the trial ... ."

Petitioner asserts that his absence during the Court's discussion with the jury was a violation of his right to confrontation, right to an impartial jury and his right of due process of the law under the Federal and State Constitutions.

Petitioner recognizes that in People v Morgan, 400 Mich 527, 535-536 (1977), the Michigan Supreme Court rejected the principle that inquiry to an accused is "conclusively presumed" from every absence during the course of the trial and adopted the test in Wade v United States, 124 U.S. App DC 356, 360; 441 F2d 1046, 1050 (1971), to determine whether a defendant's absence from a part of a trial requires reversal:

> "It is possible that defendant's absence made no difference
> in the result reached.   The standard by which to determine
> whether reversible error occurred is * * * whether there is
> 'any reasonable possibility of prejudice'."

In   the   instant   case,   Petitioner,   Tommie   Lee   Seymore,   and   his Co-Defendant, Roderick Bass, were jointly tried for first degree murder. On December 10, 1990, a case of jury tampering was brought to the judges attention.   Present at the bench was juror No. 13, 10, 6, 5, and 2, the Judge,

the Prosecutor and Counsel for both Defendants.  In the court room at the Defense table was Co-Defendant, Roderick Bass.  Petitioner was not in the Court room during this brief questioning.  After the questioning was over, Petitioner's attorney brought to the Court's attention that his client was not present during the questioning:

> (Petitioner's Attorney)Mr. Daniel: I'm making these statements outside the presence of the jury and my client.
> I think I'd better have my client.
>
> The Court: Sure, Sure.
>
> (Pause in proceedings)
>
> The Court: Okay.  Mr. Daniel.  Go ahead.
>
> Mr. Daniel: Yes Your Honor.
> Your Honor, I'd like to just review one thing that happened Thursday and I'm going to make a motion for a mistrial.
> (TT IV, 12/10/90, page 6).

The Petitioner was brought back into the courtroom and took a seat at the defense table, where his Co-Defendant was sitting during the entire questioning of the jurors.(See Affidavit of Roderick Bass).  While this brief questioning is going on at the bench, Mr. Bass is sitting at the defense table and during this conversation at the bench the jurors stated that the person was sitting in the courtroom Thursday that approached them:

> Juror No. 13: I was approached down in the vestibule while waiting on my ride by someone that was sitting in the courtroom Thursday.
>
> He had on a brown-like leather jacket, and he said, "I just want you to know both of my boys are innocent."
>
> The Court: The person is out there now?
>
> Juror No. 13: No, he is not out there now.
>
> Juror No. 10: No.
> (TT IV, 12/10,90, pages 3-6)

With Mr. Bass sitting at the defense table and the judge asking the jurors "is he in the courtroom now" and the Petitioner not being present, the jurors

40

could have speculated adversely about Petitioner's absence and the guy that approached them. Petitioner's absence denied him of his right to confront and question the five jurors about the effect this stranger's misconduct had upon them, and how it would affect their determination of his guilt or innocence. He was denied the opportunity to see their demeanor and weigh their responses, and then act accordingly to insure a fair and impartial jury. He was denied the opportunity to consult with Counsel on this jury issue.

There is a reasonable possibility that the juror's drew negative inferences from the Petitioner's absence. The potential for negative inference is heightened where, as here, the five jurors notices Petitioner's absence, while his Co-defendant is present during this crucial point in trial, where the jurors revealed that they were threatened on behalf of the Petitioner.

The facts must always be examined to determine whether they are such that Petitioner's absence at that point did not or could not have affected his substantial rights in his defense. People v Thomas, 46 Mich App 312; 208 NW2d 51 (1973). By Petitioner's absence the jurors could have speculated that he had something to do with them being threatened and not his Co-Defendant, thereby adversely speculating about Petitioner's absence and finding Petitioner guilty and Mr. Bass not guilty. "The sum of the factors exacerbated the prejudice. Therefore this error was not harmless." Valdez v Gunter, 782 F.Supp 99 (D. Colo 1992).

In People v Nickopoulos, 40 Mich App 146, 151; 198 NW2d 51 (1972), by Judge Holbrook, this Court said:

> "The defendants and their attorneys had a constitutional right to be present at the inquiry concerning jury tampering conducted by the trial judge in this case. We rule that such an inquiry constitutes a critical stage in the proceedings.

41

> "The failure of the court to afford defendants in the instant
> case the right to be present at the inquiry, absent a waiver
> of this constitutional privilege, entitles defendant to a new
> trial without proof of actual injury of prejudice. People v
> Medcoff, 344 Mich 108; 73 NW2d 537 (1955).

It is evident from the record that jury tampering occurred in the present case. According to Nickopoulos, a new trial should be granted without the Petitioner having to prove actual prejudice.

In People v Fountain, 43 Mich App 489; 204 NW2d 532 (1972), when jury tampering occurred, the Court of Appeals found that it would be a miscarriage of justice to grant one defendant a new trial and not grant his two Co-Defendants the same:

> "Similarly, in the present case the defendants and their
> attorneys had a constitutional right to be present at the
> inquiry concerning jury tampering conducted by the trial judge
> on June 30, 1969. At the conclusion of such inquiry, the trial
> judge had the authority pursuant to MCLA 768.18, supra, to
> excuse the juror in her opinion such action was justified.
> Since the court failed to afford the defendants the right to
> be present at the inquiry, Ronald Carter is entitled to a new
> trial without proof of actual injury or prejudice, his attorney
> having clearly preserved the issue on the record.   Although
> counsel for Joe Fountain and Melvin Anderson stipulated to
> the release of juror, we hold that Fountain and Anderson also
> are entitled to a new trial because to hold otherwise on the
> facts of this case might result in a miscarriage of justice."

The same can be said in the present case. Although the two cases are different, it can not be said that this did not contribute to their verdict.

Therefore, Petitioner absence from the court room during the side bar questioning the jurors affected his substantial right to a fair trial, clearly against Supreme Court Precedent and reversal is warranted.

ISSUE V

THE CONDUCT OF THE PROSECUTOR DENIED THE PETITIONER OF A FAIR TRIAL.

A criminal defendant's due process right to a fair trial, may be breached by the intemperate comments and actions of overly zealous prosecutors. The prosecutor in a criminal case has the duty to see that the defendant receives a fair trial, and he must be especially cautious where, as in a trial such as this one, the offenses charged are highly inflammatory and stir deep emotional responses. People v Brocato, 17 Mich App 277; 169 NW2d 483 (1969).

In United States v Leon, 534 F2d 667, 678–679 (CA 6, 1978), and more recently in United States v Carroll, 26 F3d 1380 (6th Cir. 1994), the United States Court of Appeals for the Sixth Circuit quoted what is termed "the oft-repeated and sometimes ignored" statement of the United States Supreme Court in Berger v United States, 295 U.S. 78, 88; 55 S.Ct. 629, 633; 79 L.Ed 1314, 1321 (1935):

> "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor – indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones.
> It is as much his duty to refrain from improper methods calculated to produce a wrong conviction as it is to use every legitimate means to bring about a just one."

It is the Petitioner's contentions that these certain statements made by the prosecutor during closing arguments were designed to inflame the passions and prejudices of the jury, causing substantial prejudice to the Petitioner. Although these remarks were isolated to one portion of the trial, closing arguments, however, this fact does not ameliorate their prejudicial impact; the remarks were misleading, inflammatory and prejudiced Petitioner's right to a fair trial.

43

It is well established that a prosecutor may not make statements calculated to arouse the passions of the jury. Viereck v United States, 310 U.S. 236; 63 S.Ct. 561; 87 L.Ed 734 (1934). Also, a prosecutor may not intentionally inject inflammatory arguments with no apparent justification except to arose prejudice. People v Bahoda, 448 Mich 261; 531 NW2d 659 (1995).

In U.S. v Solivan, 937 F2d 1146 (1991), where a "send a message" closing argument was deemed to be "a single misstep so destructive to the defendant's right to a fair trial that it constitutes reversible error." In the present case there was more than one misstep. There were numerous calculated missteps by the prosecutor during his closing arguments that were extremely inflammatory and prejudicial to the Petitioner. If not one of them is considered to be a single misstep so destructive to the Petitioner's right to a fair trial, then the totality of the inflammatory remarks must constitute reversible error. United States v Bess, 593 F2d 749 (1974).

Notably, the prosecutor's reference to the Genovese trial in New York was inflammatory. Here, he argued that the reason why no one other than the family members of the decedent testified was like in the Genovese case. (Here a woman was raped in the streets and though there were witnesses, no one came forth to testify to what they had seen. It was speculated that the reason why the witnesses did not come forth to testify was because the Mafia was involved and that there would be serious repercussion for anyone who came forward.)

The efforts of the prosecutor were not isolated, nor were they accidentally injected. During closing arguments the prosecutor stated that Petitioner had a "Mafia like family." Defense counsel for Petitioner did object, but the trial court made no ruling.(TT IV, 12/10/90, page 114). See U.S. v Johnson, 968 F2d 768, 772 (8th Cir. 1992). The prosecutor rephrased

the term to "Dope Seller." This statement by the prosecutor, "Mafia like family," were like "live wires" which could not help but leave a bad impression on the jury. People v Hunter, 218 Mich 525, 527; 188 NW 346 (1922). these statements were calculated to inflame the passions of the jury, "no cautionary instruction, however swiftly and forcibly given, can safely eradicate it's effects." Pierce v United States, 86 F2d 949, 952-53 (6th Cir. 1936)

The word "Mafia" had no legal relevance in Petitioner's trial, therefore the prosecutor had to calculate the use of the word, considering he used the Genovese case and the statement "Mafia like family." The jury could have drew inferences considering what happened in the Genovese case, that the witnesses were scared away and threatened by the Petitioner's so called "Mafia like family," that the witnesses against the Petitioner were scared to testify and the only people that were not afraid were the decedent's family.(It cannot be assumed that the jurors did not know about the Genovese case, jurors are from a broad scope of the community and the knowledge they posses is not limited). Also, when the jurors were approached on behalf of the Petitioner, an attempt was being made to intimidate the jurors into finding the Petitioner not guilty. A tactic that is associated with the Mafia.

In United States v Love, 534 F2d 87 (1976), the prosecutor for no proper purpose injected into trial the spectre of organized crime and the Mafia. That Court ruled that to mention that the defendant was part of an organization "of ill character like the Mafia or anything like that" injected into trial a highly prejudicial suggestion that appellant was part of a widely publicized enterprise reputedly involved in organized crime. The district judge properly reprimanded the attorney for asking such a question in open

court. That prosecutorial misconduct, by itself, required reversal of Petitioner's conviction.

In the present case the prosecutor for no proper purpose injected into trial the spectre of organized crime and the Mafia, accusing the Petitioner of having a "Mafia like family." In Love, supra, the Judge reprimanded the attorney in open court for asking a question using the word Mafia. See United States v Perry, 512 F2d 805 (1975). The defense objected, but there was no action taken by the court in the present case. There was no jury instruction given to disregard the highly inflammatory remark, nor did the court admonish the prosecution. In U.S. v Carroll, 26 F3d 1380 (6th Cir. 1994), the court ruled that it was reversible error for the trial judge not to admonish the prosecutor's improper flagrant remarks at closing argument. (See also Bess, supra.)

The above statement by itself requires a reversal of Petitioner's conviction, Love, supra. The prosecutor clearly overstepped his bounds of being zealous and the transgression of the prosecutor was egregious.

Further adding insult to injury and rubbing salt into the wound, the prosecutor injected into trial the alleged drug dealing of the Petitioner. Given the nature of this crime and the wider social context which the prosecutor sought to bring on the proceedings, considering the nations drug crisis, the purpose and effect of the comments were meant to arouse the passions and prejudices of the jurors. U.S. v Solavin, 937 F2d 1146 (6th Cir. 1991). Calling the drug business terrorism, and alluding to the Petitioner as a terrorist:

> "Ladies and gentlemen, this isn't like, you know, playing canasta, this drug business. We're talking about terrorism. People have to enforce their turf and what may be the rules to you and I, somebody dealing dope doesn't apply here. We don't deal with AK 47 carbines to try to make sure the business deals go like we want them to go down."(TT IV, 12/10/90, pages

46

115–116)

Petitioner's counsel made a timely objection to the inflammatory remark, but the trial court failed to make a ruling and failed to give the jury an instruction on how this statement was or was not to be used as evidence. Considering the time of the present case, which was weeks before the Persian Gulf War, and the daily attention given by the media and politicians to terrorism, to fight against terrorism. This remark addressed to the jury was highly prejudicial to the Petitioner.

In <u>Viereck</u> v <u>United States</u>, 318 U.S. 236; 63 S.Ct. 561; 87 L.Ed 734 (1943), the court stated, "At a time when passions and prejudice are heightened by emotions stirred by our participation in a great war, we do not doubt that these remarks address to the jury were highly prejudicial, and they were offensive to the dignity and good order with which all proceedings in court should be conducted."

Topped with the continuous labeling of the Petitioner as a "drug seller," an un-proven allegation, the prosecutor stated that the Petitioner had a "Mafia like family," and that the drug business was "terrorism." These words alone may have persuaded the jury to believe that, by convicting the Petitioner, they will assist in the solution of some pressing problem. <u>United States</u> v <u>Monaghan</u>, 741 F2d 1434, 1441 (1984), also see <u>Solivan</u>, supra, at 1153, "it is error for a prosecutor to direct the juror's desires to end a social problem toward convicting a particular defendant." See also <u>United States</u> v <u>Myers</u>, 550 F2d 1036, 1044 (5th Cir. 1977)"A concomitant of the presumption of innocence is that a defendant must be tried for what he did, not for who he is."

No cautionary instructions were given by the Trial Court or admonishment to the prosecutor – the statements by the prosecutor could not have been

cured by an admonition had one been given:

> "Once a jury hears something highly prejudicial in nature,
> it is unrealistic to expect them to obey an explicitly direct
> instruction to disregard it." United States v Boroin, 758 F2d
> 222 (1985).

In the present case the jury was allowed to deliberate and consider the statements without instruction.

It is clear that the statements that were made by the prosecutor were inflammatory and extremely prejudicial and considering that no curative instruction was given by the Trial Court or admonishment to the prosecutor, they could have but one result - to deny Petitioner of a fair and impartial trial. Considering the daily news on terrorism and that "this nation is in the mist of an on going crisis, properly termed the "war on drugs," this crisis does not create an excuse to impinge on the constitutional right to a fair trial." Solivan, supra. The prosecutor clearly impinged on the Petitioner's right to a fair trial.

There were timely objections made by Defense counsel to protest these egregious statements by the prosecutor and to protect Petitioner's right to a fair trial, but the Court would not rule on the objections, nor would the Court give a cautionary instruction. Petitioner contends that if the court would have given a cautionary instruction, that the above statements were so prejudicial "that no cautionary instruction, however swiftly and forcibly given, can safely eradicate its effect." Pierce, supra.

> "Presently our nation is plagued with the destructive effects
> of the illegal importation and distribution of drugs. At this
> critical time, our Constitution remains a loadstar for
> protections that shall ensure the most pernicious affronts
> to our society... The drug crisis does not license the
> aggrandizement of governmental power in lieu of the civil
> liberties. Despite the devastation wrought by drug trafficking
> in communities nationwide, we cannot suspend the precious rights
> guaranteed by the Constitution in an effort to fight the "War
> on Drugs."(Emphasis added) United States v Radka, 904 F2d 357
> (6th Cir. 1990).

48

Therefore, Petitioner was denied his right to a fair trial, by inflammatory statements by the prosecutor and reversal is required.

## RELIEF REQUESTED

Petitioner prays that this Court GRANTS this Writ of Habeas Corpus and Order the Trial Court to grant the Petitioner a new trial or any other relief the Petitioner is entitled to and in the least grant Petitioner a Remmer Hearing before a different judge that haven't been previously recused from Petitioner's case.

Sincerely,

Mr. Tommie L. Seymore 231863
In Per Se
Thumb Correctional Facility
3225 John Conley Dr.
Lapeer, Michigan 48446

Dated: //- 3c--c7

49

# CIVIL COVER SHEET FOR PRISONER CASES

**Case No.** 07-15166          **Judge:** George Caram Steeh          **Magistrate Judge:** Paul J. Komives

**Name of 1ˢᵗ Listed Plaintiff/Petitioner:**

Tommie Seymore

**Name of 1ˢᵗ Listed Defendant/Respondent:**

Millicent Warren

**Inmate Number:** 213863

**Additional Information:**

**Plaintiff/Petitioner's Attorney and Address Information:**

**Correctional Facility:**

Thumb Correctional Facility

3225 John Conley Drive
Lapeer, MI 48446
LAPEER COUNTY

---

**BASIS OF JURISDICTION**
☐ 2 U.S. Government Defendant
☒ 3 Federal Question

**NATURE OF SUIT**
☒ 530 Habeas Corpus
☐ 540 Mandamus
☐ 550 Civil Rights
☐ 555 Prison Conditions

**ORIGIN**
☒ 1 Original Proceeding
☐ 5 Transferred from Another District Court
☐ Other:

**FEE STATUS**
☐ IFP *In Forma Pauperis*
☒ PD Paid

---

**PURSUANT TO LOCAL RULE 83.11**

1. **Is this a case that has been previously dismissed?**
   ☐ Yes          ☒ No
   ➤ If yes, give the following information:

   Court: _____

   Case No: _____

   Judge: _____

2. **Other than stated above, are there any pending or previously discontinued or dismissed companion cases in this or any other court, including state court? (Companion cases are matters in which it appears substantially similar evidence will be offered or the same or related parties are present and the cases arise out of the same transaction or occurrence.)**
   ☐ Yes          ☒ No
   ➤ If yes, give the following information:

   Court: _____

   Case No: _____

   Judge: _____